**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| [redacted] **("SUBJECT PREMISES-1");** | **Case No.** GLS-21-1202 |
| **THE PERSON OF VICTORIA TOENSING, BORN** [redacted]**, SSN ENDING IN** [redacted]**; AND** | **Case No.** GLS-21-1203 |
| [redacted] **("SUBJECT PREMISES-2").** | **Case No.** GLS-21-1204 |
| | **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, [redacted], being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). In the course of my experience and training in this position, I have participated in criminal investigations into federal offenses involving public corruption and violations of the foreign agent registration laws. I also have training and experience executing search warrants, including those involving electronic evidence such as cellphones and computers.

2. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and

the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## REQUESTED WARRANTS

3. I make this Affidavit, pursuant to Federal Rule of Criminal Procedure 41, in support of an application for warrants to search (a) the Premises particularly described as [redacted] ("SUBJECT PREMISES-1"), for, and to seize, the Subject Devices described in Attachment B (the "SUBJECT DEVICES"), (b) the person of Victoria Toensing, born in [redacted], with SSN ending in [redacted], including any personal effects, for, and to seize, the SUBJECT DEVICES, as described in Attachment B, and (c) the Premises particularly described as [redacted] ("SUBJECT PREMISES-2," collectively with SUBJECT PREMISES-1, the "SUBJECT PREMISES"), for, and to seize the SUBJECT DEVICES, as described in Attachment B,.

4. SUBJECT PREMISES-1 is further particularly described as a white, two-story residence with columns in the front, as pictured below:

[redacted]

5. SUBJECT PREMISES-2 is further particularly described as a gray and white, two-story residence as pictured below:

[redacted]

6. The SUBJECT DEVICES are particularly described as follows:

a. An Apple iPhone 7 which was registered to the telephone number [redacted] ("Toensing Number").

b. A silver Apple iPad Pro 9.7 (the "Toensing iPad").[1]

7. The SUBJECT DEVICES are expected to be (i) in Toensing's possession, custody, or control, or (ii) used by or otherwise associated with Toensing and located in the SUBJECT PREMISES at the time of the execution of the applied-for warrants. The requested warrants would

---

[1] Based on my review of materials obtained from Apple, I have learned that the email account [redacted] is registered to an Apple iCloud account (the "Toensing iCloud"), which is registered to both her cellphone (assigned the Toensing Number), and the Toensing iPad, meaning that text messages, emails, and other materials found on her iCloud account are located on either her cellphone or her iPad or both. Based on my review of the Prior Search Warrant Returns (as the term is defined herein), it appears that the messages sent from the Toensing iCloud were sent from the Toensing iPad, but messages sent to the Toensing iCloud were delivered to her cellphone (assigned the Toensing Number), the Toensing iPad, or both.

authorize the search of any closed containers or items contained on Toensing's person or in Toensing's personal effects for the SUBJECT DEVICES, as evidence, or instrumentalities of the TARGET OFFENSES, as particularly described in Attachment B.[2]

**STATUTORY AUTHORITY**

8. As detailed herein, Victoria Toensing is the subject of an FBI investigation into violations of federal law. The statutes that Toensing may have violated include the following:

a. Title 22, United States Code, Sections 612 and 618, which provides that it is a federal offense to act as an agent of a foreign principal without registering with the Attorney General for certain specified activities,

b. Title 18, United States Code, Section 2, which provides that it is a federal offense to attempt to and willfully cause a violation of the foregoing statutes, and

c. Title 18, United States Code, Section 371, which provides that it is a federal offense to conspire to violate the foregoing statutes.

These offenses are referred to herein collectively as the "TARGET OFFENSES." I submit that there is also probable cause to search SUBJECT PREMISES-1, Toensing's person, and SUBJECT PREMISES-2, as further described in Attachments A-1, A-2, and A-3, respectively, for the SUBJECT DEVICES described in Attachment B.

[2] If the SUBJECT DEVICES are seized pursuant to these applied-for warrants, then the FBI intends to bring the SUBJECT DEVICES to the Southern District of New York and seek judicial authority to search any electronically stored information contained therein for evidence of the TARGET OFFENSES.

**PRIOR SEARCH WARRANT APPLICATIONS REFERENCED BELOW**

9. In the course of the investigation discussed below, the United States Attorney's Office for the Southern District of New York ("USAO") and FBI sought and obtained search warrants that have yielded evidence that is described below. As is relevant for the instant application, the following search warrants were previously obtained:

a. On or about January 18, 2019, the USAO and FBI sought and obtained from the Honorable Sarah Netburn, Magistrate Judge for the Southern District of New York, a search warrant (the "January 18 Warrant") for records in email accounts belonging to Lev Parnas, Igor Fruman, and others. On or about October 17, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the January 18 Warrant returns for evidence of additional offenses.

b. On or about May 16, 2019, the USAO and FBI sought and obtained from the Honorable Stewart Aaron, Magistrate Judge for the Southern District of New York, a search warrant (the "May 16 Warrant") for records in iCloud accounts belonging to Parnas and Fruman, among others. On or about October 21, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant to search the May 16 Warrant returns for evidence of additional offenses.

c. On or about August 14, 2019, the USAO and FBI sought and obtained from the Honorable Henry B. Pitman, Magistrate Judge for the Southern District of New York, a search warrant (the "August 14 Warrant") for email accounts belonging to Parnas, Fruman, and others.

d. On or about November 4, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a

warrant (the "November 4 Warrant") for records in iCloud accounts belonging to Giuliani and Victoria Toensing.

e. On or about December 13, 2019, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant (the "December 13 Warrant") for records in an email account belonging to Toensing.

f. Together, the records obtained pursuant to the January 18 Warrant, May 16 Warrant, August 14 Warrant, November 4 Warrant, and December 13 Warrant are referred to as the "Prior Search Warrant Returns."

g. On or about April 13, 2021, the USAO and FBI sought and obtained from the Honorable J. Paul Oetken, United States District Judge for the Southern District of New York, a warrant for historical and prospective location information for the Toensing Number (the "GPS Warrant").

## PROBABLE CAUSE

### A. Probable Cause Regarding Subjects' Commission of the Target Offenses

Overview

10. The FBI and USAO are investigating whether Rudolph Giuliani, Victoria Toensing, and Lev Parnas and others undertook actions to cause the removal of the United States Ambassador to the Ukraine, Marie Yovanovitch, including actions detailed below at the request and/or under the direction of a foreign government, entity, or person, in violation of the Foreign Agents Registration Act ("FARA").[3] Specifically, as discussed below, there is probable cause to believe

[3] FARA criminalizes acting as an agent of a foreign principal without registering with the Attorney General for certain specified activities. Activities covered by FARA include acting as a "publicity agent" or engaging in the United States in "political activities." *See* 22 U.S.C. §§ 611-12. "[P]olitical activities" are defined in the statute as "any activity . . . [to] influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the

that starting in at least January 2019, Giuliani, Toensing, and Parnas engaged in a multi-pronged lobbying effort aimed at causing Ambassador Yovanovitch's removal, all while hiding the fact that they were doing so at the request and direction of Yuriy Lutsenko, a Ukrainian official from whom Giuliani, Toensing, and Parnas sought personal compensation and gain. As discussed below, after meeting with Lutsenko on two occasions in January and February 2019, Giuliani lobbied then-President Donald J. Trump on at least three occasions and lobbied then-Secretary of State Michael Pompeo on at least two occasions for the Ambassador's removal. When those efforts appeared to have failed, Giuliani, Toensing, and Parnas appear to have devised and participated in a coordinated media campaign aimed at using and publicizing disinformation from Lutsenko. It appears that Giuliani, together with Toensing and Parnas, were incentivized to undertake these efforts on behalf of Lutsenko in at least two different ways. First, in the same discussions in which Lutsenko raised the firing of Ambassador Yovanovitch, he mentioned the possibility of retaining Giuliani to aid in a legal matter or lawsuit in the United States to recover purportedly stolen Ukrainian assets. As discussed below, Giuliani was interested in being engaged to do that work, and proposed a retainer with a $200,000 upfront payment. Thus, it appears that Giuliani and Toensing took steps to cause the firing of the Ambassador to prove to Lutsenko what they could achieve in order to, among other things, secure the legal representation. Giuliani also involved Toensing in that retainer, and she too eagerly anticipated being retained by Lutsenko. Second, as discussed below, it appears that Giuliani and Toensing were also motivated to act at

---

United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." *Id.* As relevant here, FARA requires any person acting "at the order, request, or under the direction or control" of (i) a foreign principal, or (ii) a person whose activities are "indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal," to register with the Attorney General and to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities. *Id.*

Lutsenko's direction and on Lutsenko's request so that Lutsenko would provide derogatory information about, among other things, Joseph and Hunter Biden, which would potentially be politically valuable to Giuliani and Toensing. The efforts were successful: the Ambassador was removed from her post in late April 2019. Moreover, despite all these efforts to lobby for the removal of the Ambassador on behalf of Lutsenko, Giuliani, Parnas, and Toensing never filed a FARA registration.

11. As set forth below, based on my review of the Prior Search Warrant Returns, as well as subpoena returns and public sources, there is probable cause to believe that Toensing will be in possession of, and the SUBJECT PREMISES will contain, evidence and instrumentalities of the TARGET OFFENSES, specifically the SUBJECT DEVICES.

Giuliani's Involvement with Parnas in 2018

12. Parnas is a Florida-based Ukrainian-American businessman.[4] Giuliani first met Parnas in or around July 2018, and based on my review of materials obtained pursuant to the May 16 Warrant, it appears that over the next several months they started communicating and spending time together on a regular basis. Among other things, based on my review of records obtained pursuant to the January 18 Warrant, it appears that in or around August 2018, Parnas raised with

[4] Parnas has been charged alongside co-defendants Igor Fruman, David Correia, and Andrey Kukushkin in a seven-count indictment which charges Parnas with (i) conspiring to make straw donations, in violation of 18 U.S.C. § 371, 52 U.S.C §§ 30122, 30109(d)(1)(A) & (D); (ii) making false statements to the Federal Election Commission, in violation of 18 U.S.C. § 1001(a)(2) and 2; (iii) falsification of records, in violation of 18 U.S.C. § 1519 and 2; (iv) conspiring to violate the foreign donor ban, in violation of 18 U.S.C. § 371, 52 U.S.C §§ 30121, 30122, and 30109(d)(1)(A) & (D); (v) soliciting a contribution from a foreign national, in violation of 52 U.S.C. § 30121, 30109(d)(1)(A), and 18 U.S.C. § 2; (vi) aiding and abetting the making of a contribution from a foreign national, in violation of 52 U.S.C. § 30121, 30109(d)(1)(A), and 18 U.S.C. § 2; and (vii) conspiring to commit wire fraud in connection with his business "Fraud Guarantee," in violation of 18 U.S.C. § 1349. Parnas has pleaded not guilty and is scheduled to proceed to trial in October 2021. *See United States v. Parnas, Fruman, Correia, and Kukushkin*, S1 19 Cr. 725 (JPO).

Giuliani the prospect of being hired by Parnas's nascent insurance business, Fraud Guarantee. On or about August 16, 2018, Giuliani emailed Parnas's business partner, David Correia,[5] a one-page draft agreement between Fraud Guarantee and Giuliani's consulting and management firm, Giuliani Partners, which contemplated that Fraud Guarantee would pay Giuliani Partners $500,000 upon signing the agreement, and $100,000 per month thereafter. Based on my review of the materials obtained pursuant to the January 18 Warrant and May 16 Warrant, I know that Giuliani repeatedly requested that Parnas complete the engagement and pay Giuliani Partners the $500,000, and in or about September and October 2018, Parnas induced a third party to make two payments totaling $500,000. While Giuliani stayed in regular contact with Parnas after receiving the payments, it appears that he did little to no work for Fraud Guarantee.

13. It appears based on my review of the Prior Search Warrant Returns that in or around November or December 2018, Parnas started providing Giuliani with information about Ukraine. For instance, based on my review of those materials, on or about December 7, 2018, Parnas forwarded Giuliani a copy of a letter dated May 9, 2018, which it appears Parnas had caused Congressman Pete Sessions to write and send to Secretary Pompeo, and which called for the firing of Ambassador Yovanovitch. On or about December 14, 2018, Parnas told Giuliani that he was traveling to Ukraine the following day, and texted Giuliani a link to a Ukrainian news article

[5] Correia was charged alongside Parnas in indictment S1 19 Cr. 725 (JPO), and has since pleaded guilty and been convicted of (i) making false statements to the Federal Election Commission, in violation of 18 U.S.C. § 1001(a)(2) and 2; and (ii) conspiring to commit wire fraud in connection with "Fraud Guarantee," in violation of 18 U.S.C. § 1349. In February 2021, Correia was sentenced to a term of one year and one day's imprisonment, and is currently serving his sentence.

alleging that two Ukrainian government officials broke Ukrainian law in revealing Paul Manafort "black ledgers," which were relevant to the Special Counsel's Office ("SCO") investigation.[6]

14. Based on my review of the Prior Search Warrant Returns, I have learned that while in Ukraine, Parnas met with multiple current and former Ukrainian government officials, including Viktor Shokin, the former Prosecutor General, which is the position equivalent in Ukraine of the United States Attorney General. Based on my review of materials obtained via the Prior Search Warrant Returns, I have learned that Correia created notes during or shortly after the Ukraine trip that reflected that Ambassador Yovanovitch was a topic of conversation, and that Shokin and Lutsenko (the then-Prosecutor General) would each provide information regarding alleged corruption by now-President Biden and Ambassador Yovanovitch. Based on my review of those same materials, it appears that Correia went to meet with Giuliani shortly after returning to the United States to discuss, among other things, the topics contained in those notes. Additionally, based on my review of the Prior Search Warrant Returns, I have learned that upon returning to the United States, Parnas solicited Giuliani's assistance in arranging a visa for Shokin to come to the United States and, among other things, meet with Giuliani. Based on my review of the Prior Search Warrant Returns, as well as records provided by the State Department and my participation in interviews with officials at the State Department, Giuliani did, in fact, make requests to officials at the State Department that they grant a visa to Shokin, but Giuliani was ultimately unsuccessful in securing a visa.

15. Notwithstanding the negative information that was provided by Parnas to Giuliani in 2018 about Ambassador Yovanovitch, and Giuliani's inability to obtain a visa for Shokin—

[6] Based on my involvement in this investigation to date, it is not clear whether Giuliani requested the materials from Parnas because he was interested in Ukraine as a result of the SCO investigation or for other reasons, or if Parnas provided them to Giuliani unprompted.

which from my review of the Prior Search Warrant Returns and participation in the investigation it appears that Parnas and Shokin, if not Giuliani, blamed at least in part on Ambassador Yovanovitch—Giuliani did not seek the Ambassador's removal until after meeting with Lutsenko in late January and early February 2019, as discussed below.

Giuliani's January 2019 Meetings with Lutsenko and Shokin

16. On or about January 25 and 26, 2019, Giuliani, George Boyle (who works for Giuliani Partners), Parnas, and Fruman met with Lutsenko, Gyunduz Mamedov, and Glib Zagorii (both of whom worked with Lutsenko) at the Offices of Giuliani Partners in Manhattan. I have reviewed a three and a half page memorandum prepared by Boyle regarding the two-day, multi-hour meeting. The memorandum was obtained from the State Department, and was provided to the State Department by Giuliani, as discussed below. From my review of that memorandum, as well as public statements subsequently made by Parnas and Lutsenko, I have learned, among other things, the following:

a. According to the memorandum, during the January 25 and 26 meetings, Lutsenko stated, in sum and substance, that his predecessor, Shokin, had opened an investigation into Burisma, in which Hunter Biden, a board member, was implicated. According to the memorandum, Lutsenko also provided information regarding the Manafort "black book." The memorandum also indicated that Lutsenko raised two issues of potential importance to himself. First, it appears from the memorandum that Lutsenko and Giuliani discussed Ambassador Yovanovitch, whom Lutsenko asserted "protects" the "ineffective" Specialized Anticorruption Prosecutor's Office in Ukraine, who Lutsenko claimed asked him to close three cases. According to the memorandum, Lutsenko stated that, in his then-capacity as Prosecutor General of Ukraine, he had re-initiated an investigation into Hunter Biden. Second, it appears from the memorandum that Lutsenko raised allegations that the global investment firm Franklin Templeton held

approximately $7 billion dollars in money that had been embezzled from Ukraine since 2010 to benefit pro-Russian Ukrainians. A separate memorandum that appears to also have been prepared by Boyle indicates that Giuliani also spoke by phone with Shokin, who was in Ukraine at that time, on January 23, 2019 regarding some of the same allegations regarding Burisma.

b. Based on my review of statements subsequently made by Lutsenko that were quoted in an article published by the *New Yorker*, Lutsenko claimed that in 2018, his office sent a letter to the legal attaché at Embassy Kiev, requesting the Americans' assistance in recovering assets from Franklin Templeton, but that his office did not receive the requested assistance in pursuing these funds. Accordingly, it appears that Lutsenko was seeking assistance in recovering assets from or bringing legal action against Franklin Templeton, and after he was unsuccessful through formal channels, he raised the issue with Giuliani.

c. Based on my review of the transcript of a televised January 16, 2020 interview of Parnas by Rachel Maddow, I have learned that Parnas stated, among other things, that Lutsenko wanted Yovanovitch removed for "his own career reasons" and that "both Lutsenko and Shokin (the former Prosecutor General) had an interest in getting rid of" Yovanovitch. While it is not clear from Parnas's statements the timing of when these messages were conveyed by Lutsenko, Parnas was also asked whether "Lutsenko [was] saying in effect, listen, if you want me to make these Biden allegations, you're going to have to get rid of this ambassador," to which Parnas replied, "absolutely."[7]

[7] Based on my conversations with the prosecutors assigned to this investigation, I have learned that on or about October 28, 2019, Parnas's counsel proffered to the USAO and FBI that all of Parnas's efforts to remove Yovanovitch were done at the direction of President Trump and/or Giuliani, who was himself acting at the direction of President Trump. For the reasons discussed herein, the USAO and FBI do not regard this claim as credible, and believe the evidence provides probable cause to believe that Giuliani and Parnas were acting at the request and/or under the direction and request of one or more foreign principals, including Lutsenko.

17. Based on my review of materials obtained via the Prior Search Warrant Returns, including text messages between Parnas and Giuliani, I have learned that Giuliani and Parnas exchanged several messages about Lutsenko following those meetings in New York. Specifically, on or about February 4, 2019, Giuliani texted Parnas to have a safe flight to D.C., and said "need to lock up law suit for AG [o]f Ukraine," which appears to be a reference to Lutsenko retaining Giuliani to file a lawsuit to recover the Franklin Templeton assets. On or about February 10, 2019, Giuliani texted Parnas, "Any word on guy [Lutsenko] coming here" and in connection with their upcoming trip to Poland and Ukraine, "Any progress on plane tomorrow[.]" Parnas responded by text that "[t]hey," in sum and substance, were calling him shortly and Parnas would find out the details. Shortly thereafter, Parnas texted Giuliani, in sum and substance, that Lutsenko would meet Giuliani and Parnas on or about February 12, 2019 in Warsaw, Poland. Based on my review of U.S. border crossing records, materials obtained pursuant to the May 16 Warrant, and public reporting, it appears that Giuliani and Parnas did then travel to Poland.

<u>Anticipated Retention of Giuliani, Toensing, and diGenova by Lutsenko and Continued Lobbying for Ambassador Yovanovitch's Removal</u>

18. Based on my review of materials obtained via the Prior Search Warrant Returns, I have learned that in or around February 2019, Parnas, Giuliani, and Toensing exchanged messages and a draft retainer agreement reflecting Giuliani Partners and Toensing's anticipated representation of Lutsenko in connection with what appears to be the Franklin Templeton allegations. Based on my review of the Prior Search Warrant Returns, as discussed below, it

---

I am also aware that on or about March 4, 2020 Parnas himself provided information to the USAO and FBI, in a proffer session. That information is not being set forth herein as a basis for probable cause. Nonetheless, I am aware that Parnas described ulterior motives for his efforts to seek Ambassador Yovanovitch's removal, in addition to the fact that Lutsenko had requested her removal, including among other things his desire to ingratiate himself with Giuliani and President Trump.

appears that Giuliani, Parnas, and Toensing undertook efforts to cause the removal of Ambassador Yovanovitch from her post at or around the same time they were drafting a retainer agreement to represent Lutsenko. Additionally, as discussed below, it appears from the same materials that those efforts to cause the Ambassador's removal were undertaken at Lutsenko's request or direction, at least in part, in order to secure the retainer agreement to represent Lutsenko in the Franklin Templeton matter. Moreover, as discussed below, based on my review of the Prior Search Warrant Returns, it appears that Lutsenko also incentivized Giuliani, Toensing, and Parnas to cause the Ambassador to be fired by agreeing to provide negative information about now-President Joseph Biden and Hunter Biden, in addition to information Giuliani could use to attack the SCO investigation, all of which appears, from text messages and emails, to have been of significant interest and value to them. Specifically, with respect to the foregoing, I have learned the following, based on my review of materials obtained via the Prior Search Warrant Returns:

a. Toensing became involved in Giuliani and Parnas's efforts to remove Ambassador Yovanovitch on or around February 9, 2019. Based on my review of materials obtained from the Prior Search Warrant Returns, I have learned that Giuliani invited Toensing to participate in the matter, with what appears to be the expectation that in exchange for Toensing, Giuliani, and Parnas's efforts to remove Ambassador Yovanovitch from her post, Lutsenko would reward Toensing and Giuliani with a several-hundred thousand dollar retainer agreement which expressly contemplated future paid work by Toensing and Giuliani.[8] Based on my review of

[8] Based on my review of a financial analysis prepared based on bank records and public reports, it appears that around this time, Giuliani had a financial interest in receiving a retainer agreement from Lutsenko. Specifically, in May 2018, Giuliani left his former law firm and its substantial compensation package. Based on my review of a financial analysis of bank records that have been collected to date (which may not include all of Giuliani's checking and credit card accounts), on or around January 25, 2018, Giuliani had approximately $1.2 million cash on hand, and approximately $40,000 in credit card debt. By contrast, on or around January 25, 2019, right

materials obtained via the Prior Search Warrant Returns, including text messages between Toensing (who was using both the Toensing Number and/or other SUBJECT DEVICES linked to the Toensing iCloud) and Giuliani, I have learned that Toensing and Giuliani had a preexisting relationship and discussed matters related to press appearances and the SCO investigation (they both represented individuals in connection with that inquiry), and that Giuliani introduced Toensing to Parnas in or around February 2019.

b. On or about February 9, 2019, Toensing texted Parnas from the Toensing Number, "Anything happening? My emails to you have come back." As discussed above, based on my review of travel records, I have learned that Parnas and Giuliani traveled to Warsaw, Poland and met with Lutsenko, on February 11, 2019.[9] On or about February 11, 2019, Toensing texted Giuliani and Parnas from the Toensing Number: "Is there absolute commitment for HER to be gone this week?" On or about the same day, Giuliani texted back, "Yes not su[r]e how absolute [w]ill get a reading in morning and call you. Pompe[o] is now aware of it. Talked to him on Friday [February 8, 2019]."

---

before he met with Lutsenko, Giuliani had approximately $400,000 cash on hand in those same accounts and approximately $110,000 in credit card debt. By on or around February 16, 2019, his account balances had dropped to approximately $288,000 and his credit card debt remained over $110,000.

[9] Based on my review of public reporting, I have learned that according to an article published on September 29, 2019 in *Reuters*, Giuliani admitted that he met Lutsenko in Warsaw in February 2019 after first meeting him in New York in January, but that the meeting with Lutsenko in Warsaw was "really social . . . I think it was either dinner or cigars after dinner. Not opportune for substantive discussion." However, this does not appear to be accurate, as described herein, Giuliani circulated a draft retainer agreement between Lutsenko, Giuliani Partners, and diGenova & Toensing (a law firm owned by Toensing and her husband Joseph diGenova) only five days after meeting with Lutsenko, and communicated with Parnas and Toensing about lobbying Pompeo and Trump to remove Yovanovitch on the same day, and in the days following, his meeting with Lutsenko.

c. Toensing, Giuliani, and Parnas exchanged numerous messages following the meeting with Lutsenko regarding Giuliani's drafting of a retainer agreement for Lutsenko, and Parnas's need for information on the status of Ambassador Yovanovitch while he was in Ukraine and meeting with Lutsenko. Specifically, on or about February 14, 2019, Toensing, using a Subject Device linked to the Toensing iCloud, texted Giuliani: "How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA." Toensing then texted Parnas from the Toensing Number a copy of what she described in a text as her "nudge to Rudy." Parnas then texted Toensing at the Toensing Number to "nudge [Giuliani] about the Mrs A.," which appears to be a reference to Ambassador Yovanovitch. Toensing and Parnas exchanged several messages (using the Toensing Number) stating, in sum and substance, that they had followed up with Giuliani about the retainer agreement and complaining about the delay.

d. It appears that Parnas continued to press Toensing and Giuliani for movement on the retainer agreement and the Ambassador's removal while he was in Ukraine meeting with Lutsenko. On or about February 15, 2019, Toensing texted Parnas from the Toensing Number that she had "[t]alked to Rudy" but "[d]id not bring up Retainer as I figured you are on ground in need of it." On or about February 16, 2019, Parnas texted back that he was waiting to hear from Giuliani, and stated to Toensing by text to the Toensing Number that he "really need[ed] to know [the] status of madam A. [w]hile I'm here." Based on my review of travel records for Parnas, it appears that "here" was a reference to Ukraine. Toensing responded from the Toensing Number, "That's for Rudy to get tonight." Later that day, Giuliani texted Toensing at the Toensing iCloud: "I'm heading for Florida. Lev meeting with our friend and going over retainer will get it to him today." Based on my involvement in this investigation and review of text messages, I believe that "our friend" was a reference to Lutsenko. Toensing sent Giuliani's message to Parnas

and asked if "Rudy c[a]me through," and Parnas confirmed to Toensing that he had received a draft.

e. On or about February 16, 2019, Giuliani sent Parnas and Fruman a draft retainer agreement between "Yuriy Lutsenko, as the General Prosecutor of Ukraine," and Giuliani Partners, Toensing, and diGenova. The retainer amount was $200,000 for services by Giuliani, Toensing, and diGenova in recovering "sums of money in various financial institutions outside Ukraine." Based on my involvement in this investigation, I believe that the description in the agreement of recovering "sums of money in various financial institutions outside Ukraine" was a reference to recovering allegedly stolen assets from Franklin Templeton, which Lutsenko had raised with Giuliani at their first meeting. The agreement also stated that it was a temporary agreement to be superseded "by a long term agreement." Parnas told Giuliani that same day that he had just met with "the other gentleman," in an apparent reference to Shokin, and that it "went great call me when you can I'll update you."

f. On or about February 17, 2019, Parnas texted Toensing at a Subject Device linked to the Toensing iCloud to confirm that Giuliani had sent the retainer agreement. Toensing asked Parnas by text from the Toensing Number if Giuliani "me[]t with the guy re Amb?" to which Parnas replied, "I am still waiting on that[, m]eeting with big guy in 4 hours," an apparent reference to Giuliani meeting with then-President Trump to lobby for Ambassador Yovanovitch's removal. Toensing also texted Giuliani the Toensing iCloud, which is linked to the SUBJECT DEVICES, "What happened with the big Guy re Amb." And Giuliani replied "It is in process." Later that day, Toensing asked Parnas from the Toensing Number, "Was he successful re Amb?" to which Parnas replied "this week." On February 18, 2019, Parnas told Giuliani to make out the retainer agreement to the Ministry of Justice of Ukraine, attention to Minister Pavlo Petrenko. Giuliani

asked "How much?" and Parnas promised to call him shortly, and then followed up regarding the retainer agreement again.

g. Based on my review of materials obtained from the May 16 Warrant, public reporting and U.S. border crossing records, I have learned that Parnas met with Lutsenko regarding the retainer agreement on or around February 21, 2019, and then appears to have met again with Lutsenko several days later to obtain paperwork. On or about February 20, 2019, Parnas texted Giuliani to send wire instructions and a "signed copy by you Victoria and joe so they can execute and wire funds." Based on my involvement in this investigation, I believe that "joe" is a reference to Joseph diGenova, Toensing's husband and law partner who, as discussed herein, later made media appearances promoting the removal of the Ambassador. Later that day, Parnas confirmed that he "received signed retainer." On the day of the meeting between Parnas and Lutsenko, on or about February 21, 2019, Giuliani texted Parnas "How is it going????" to which Parnas replied, "Meeting with [Y]uri [Lutsenko] now everything good." Three days later, Giuliani again asked how things were going, and Parnas responded that he was "meeting with [Y]uri [Lutsenko] in 2 hours he has some paperwork to give us I'll call you after the meeting." On or about the same day, Toensing texted Giuliani from the Toensing iCloud, "What happened with discussion," to which Giuliani replied, "Told today getting done Saturday I said no need a confirmation and will get it tomorrow." Based on my involvement in this investigation and my review of text messages, it appears that Giuliani was referring to the execution of Lutsenko's retainer agreement and the wiring of funds. However, based on my review of bank records, it does not appear that Lutsenko wired funds to Giuliani at that time, or any subsequent time.

h. On or about February 24, 2019, Toensing texted Giuliani using a Subject Device linked to the Toensing iCloud, "Was the deed done?" On or about February 25, 2019,

Toensing texted Parnas using a Subject Device linked to the Toensing iCloud to ask, "Is she still there?" Parnas texted back, "Yes." On or about February 25, 2019, Toensing also texted Giuliani from the Toensing iCloud, which is linked to the SUBJECT DEVICES, "Is she still there?" Based on my involvement in this investigation and my review of text messages from the Prior Search Warrant Returns, it appears that Toensing was asking whether Ambassador Yovanovitch had been removed from her post.

Public Media Campaign to Remove Ambassador Yovanovitch

19. Based on my review of the Prior Search Warrant Returns and public sources, I have learned that following Parnas's meeting with Lutsenko in February 2019, and in light of the fact that Giuliani's lobbying efforts up until that point appeared to have been unsuccessful, Parnas, Toensing, Giuliani, and Lutsenko worked with a journalist, John Solomon at *The Hill*, to mount an aggressive and coordinated public media campaign aimed at discrediting and causing the removal of Ambassador Yovanovitch.[10] It appears from my review of the materials that their media campaign began within days of Lutsenko complaining, in early March 2019, to Parnas about actions that Yovanovitch had taken in Ukraine. Specifically, based on my participation in the investigation, my participation in an interview with Ambassador Yovanovitch, my review of public statements made by Lutsenko, Giuliani, and diGenova, and my review of materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a. Based on my review of articles published on or around March 6, 2019, I have learned that on or about March 5, 2019, Ambassador Yovanovitch gave a speech in which

[10] Informational materials that an agent disseminates or causes to be disseminated in interstate commerce on behalf of a foreign principal must contain labeling as required by Section 614(b) of FARA. *See* 22 U.S.C. § 614; 28 C.F.R. § 5.400 and 5.402. The articles published in *The Hill* and the subsequent tweets disseminating that information did not contain such labeling.

she called for the removal of an ally of Lutsenko's, Nazar Kholodnytsky, from his government position in Ukraine because he had been accused by the National Anti-corruption Bureau of Ukraine ("NABU"), a separate prosecutor's office, of leaking information about corruption investigations to the targets of those investigations. Yovanovitch also criticized the Ukrainian court system, which she described as riddled with compromised judges.

b. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that Lutsenko immediately complained about Yovanovitch's statements to Parnas. Specifically, on or about March 5, 2016, the day of Yovanovitch's speech, Lutsenko texted Parnas "Ambassador openly called to fire [Kholodnytsky]."[11] Parnas asked Lutsenko to call him, and Lutsenko texted back, in sum and substance, that the Ambassador had also criticized Ukrainian Supreme Court judges.

c. Based on my review of materials obtained pursuant to the May 16 Warrant, I have learned that in response to Lutsenko's complaint, on March 8, 2019, Parnas sent Toensing at the Toensing Number a text message containing a photograph of the May 2018 letter written by Congressman Sessions, and she replied by sending the contact information for Solomon. Toensing also texted Giuliani using a Subject Device linked to the Toensing iCloud to "Contact John Solomon re interview this am."

d. On or about March 8, 2019, Lutsenko texted Parnas and referred to a statement Yovanovitch made in which she called for Kholodnytsky's removal. Parnas texted back, "we are all in the loop," and wrote, in sum and substance, that they were setting up an interview between Lutsenko and a journalist – a reference to Solomon. Lutsenko then sent Parnas the contact

[11] Parnas's text messages with Lutsenko were in Russian, and my description of these messages herein are based on preliminary translations of those messages by FBI Russian language linguists.

info for Kholodnytsky, and Lutsenko wrote: "Nazar [Kholodnytsky] is waiting[,] I explained everything. Ready to talk about the l[a]ck of impartiality." Parnas and Lutsenko also discussed setting up an interview between Solomon and then-President Petro Poroshenko of Ukraine, but Lutsenko told Parnas that Poroshenko could not answer questions about "the Ambassador, Biden" in the "middle of the campaign." Based on my review of public reporting, I have learned that at the time, Poroshenko was running for re-election, which he would ultimately lose.

e. On or about March 9, Parnas texted Giuliani information about the press campaign, and stated, in sum and substance, that he had just spoken with Solomon and Lutsenko. Parnas also asked Giuliani to call Parnas so he could "update you very good stuff."

f. However, it appears that Lutsenko grew impatient with Parnas's failure to secure Ambassador Yovanovitch's removal. On or about March 11, 2019, Lutsenko texted Parnas about when he would be receiving an invitation from the "General Attorney," which appears to be a reference to the U.S. Attorney General. On or about March 13, 2019, Lutsenko texted Parnas, "I am fucking sick of everything. I did not get the visit. My Number One did not get shit. I am ready to shaft your competitor. But you want even more. We do everything. You do later. This is dishonest." Based on my participation in the investigation, this appears to be a reference to Lutsenko and others' willingness to share information about Burisma and the Bidens and frustration that Parnas could not similarly deliver on issues to include the removal of Ambassador Yovanovitch or a meeting with then-Attorney General Barr. On or about March 14, 2019, Parnas texted back, "I just spoke with our [people]. I think there is good news. When you get a chance, call me regarding your visit here." Based on my participation in the investigation, it appears that "our people" refers to Giuliani and/or Toensing.

g. At the same time, based on my review of the Prior Search Warrant Returns, it appears that Parnas, Solomon, and Toensing worked together to publicize Lutsenko's allegations through Solomon. On or about March 12, 2019, Parnas received from Shokin a written narrative and answers to questions posed by Solomon about Yovanovitch and the Bidens. Parnas forwarded Shokin's answers to Solomon. Parnas also texted with Lutsenko and conveyed additional information back to Solomon.

h. On or about March 19, 2019, Toensing texted Solomon (using a Subject Device linked to the Toensing iCloud) that she had spoken with "Rudy and Lev" and stated "I have the plan. So call when you can." Based on my review of the Prior Search Warrant Returns and public reporting, it appears that Parnas set up an interview between Solomon and Lutsenko. On or about March 20, 2019, a portion of Solomon's video interview with Lutsenko and an accompanying article entitled "Senior Ukrainian Official Says He's Opened Probe into US Election Interference" were published in *The Hill*. In his interview, Lutsenko claimed he would open an investigation into whether the director of NABU, Artem Sytnyk, attempted to "influence the 2016 vote to the benefit of Democratic presidential nominee Hillary Clinton." In a second video interview published on March 20, 2019, by Solomon in *The Hill*, Lutsenko told Solomon that Ambassador Yovanovitch had given him "a list of people whom we should not prosecute" during their first in-person meeting. *The Hill* reported that Lutsenko was not "the only person complaining about the U.S. Embassy in Kiev," and noted that Congressman Sessions wrote a "private letter asking Secretary of State Mike Pompeo to recall the current U.S. ambassador, alleging that she made disparaging statements about President Trump." *The Hill* also posted a

copy of the letter. The article quoted Sytnyk as describing Lutsenko's allegations as untrue and an "absurd attempt" to discredit NABU.[12]

i. Based on my review of materials obtained from the May 16 Warrant and public reporting, I have learned that Parnas continued working to publicize Lutsenko's allegations against Yovanovitch and texted links to Solomon's articles to many of his contacts. On or about March 20, 2019, Parnas sent [redacted], the development director of [redacted] (to whom Parnas had previously donated in the name of a corporation), links to both of Solomon's articles in *The Hill*, along with links to tweets by Laura Ingraham and Sean Hannity. Parnas instructed [redacted], "have jr retweet it," in reference to Donald Trump Jr. [redacted] did so, and confirmed to Parnas, "sent." Trump, Jr. subsequently retweeted an article summarizing Solomon's reporting in the *Daily Wire*, entitled "Calls Grow to Remove Obama's U.S. Ambassador to Ukraine." Moreover, while it is not known how he came across the article, on March 20, 2019, then-President Trump also retweeted one of the links that Parnas had sent to [redacted]: an article entitled "As Russia Collusion fades, Ukrainian plot to help Clinton emerges." [redacted] sent a copy of President Trump's tweet to Parnas.

j. Parnas frequently updated Lutsenko on the success of their press blitz in Russian-language text messages. In particular, Parnas promptly sent a screenshot of then-President Trump's tweet to Lutsenko. In an apparent effort to garner more information for Solomon, Parnas asked Lutsenko to send him "the names of the people that she said," which

[12] Based on my participation in an interview with Ambassador Yovanovitch, I have learned that each of Lutsenko's claims were either false or fabrications. Ambassador Yovanovitch did not give Lutsenko a "do not prosecute" list or direct him to prosecute, or not prosecute, anyone. Similarly, Ambassador Yovanovitch and the U.S. embassy did not show any political bias, but were focused on implementing U.S. policy in Ukraine. Indeed, Lutsenko himself retracted or otherwise walked back many of these claims in subsequent interviews and statements.

appears to be a reference to Yovanovitch and the "do not prosecute list" Lutsenko claimed she had given him. Lutsenko sent Parnas three names and described them all as "loud NABU activist[s]." Based on public reporting and my participation in this investigation, including my interview with Ambassador Yovanovitch, it appears that Lutsenko may have clashed with Yovanovitch regarding what he perceived to be a rival prosecutor's office in Ukraine, NABU in the spring of 2018, and was frustrated by her continued alignment with NABU, which appears to have provided a motive for Lutsenko to falsely claim that Yovanovitch had asked him not to prosecute "loud NABU activist[s]." Parnas congratulated Lutsenko and told him that "Today you become a world-class political figure. Glory to the Ukraine !!!" Lutsenko then texted Parnas if it was "true, that the Ambassador chick and [the head of NABU] were called to Washington," to which Parnas replied, "I will call later. We'll talk." Parnas then reported to Lutsenko by text message, in sum and substance, that then-President Trump had re-tweeted a story about Yovanovitch. Lutsenko responded, "If I am not going to get invited for an official visit in the nearest future, I will not be able to fight off our or your [people]." Based on my participation in the investigation, it appears that Lutsenko's reference to fighting off "our or your [people]" referred to their perceived enemies in Ukraine and the U.S., respectively.

k. The day after *The Hill* published the Lutsenko interview, on or about March 21, 2019, Parnas wrote Solomon and Toensing that the top news story in Ukraine was the reporting regarding Ambassador Yovanovitch, which according to Parnas prompted the Ambassador to put out a statement saying that Lutsenko was a "prime example of corruption." Based on my review of text messages, Lutsenko was upset about that statement, and the news coverage he was receiving in Ukraine. He complained to Parnas, "why the fuck do I need these kinds of adventures . . . 10 days before the election" in Ukraine. "Moreover," Lutsenko continued, "they are saying in the

State Department that my reports work in favor of corrupt officials. Great fucking help to Ukraine." Parnas responded that he would call Lutsenko and had "good news."

l. Lutsenko continued to complain to Parnas about the lack of results with respect to Yovanovitch's removal. On or about March 22, 2019, Lutsenko wrote that "It is simply that if you do not make a decision regarding the madam, you cast doubt on all of my statements, including regarding B." Based on my review of a January 16, 2020 interview with Rachel Maddow, Parnas confirmed that the "madam" was Yovanovitch and "B" was "Biden," and that Parnas understood Lutsenko to be saying, in sum and substance, that if Parnas wanted Lutsenko to make Biden allegations (and for those allegations to be taken seriously), he needed to have Yovanovitch removed. Meanwhile, Giuliani continued to lobby then-President Trump for Ambassador Yovanovitch's removal, and on or about March 22, 2019, Giuliani texted Toensing via a Subject Device linked to the Toensing iCloud, apparently in reference to then-President Trump and the letter from Congressman Sessions calling for Yovanovitch's removal, that "he has letter says she's gone no more screwing around[.]"

m. Based on my review of public reporting, Solomon's articles soon received substantially increased press attention. On or about March 22, 2019, on *The Ingraham Angle* on Fox News, Ingraham aired a segment highlighting that former-Congressman Sessions sent Secretary of State Pompeo "an urgent letter" in May 2018, asking that Ambassador Yovanovitch be removed from her position, and published a copy of that letter. DiGenova was a guest on the program, and announced: "I have learned this evening that the President has ordered her dismissal from her post. . . as a result of her activities there which were complained of by Congressman Sessions. She is known and reported by people there to have bad-mouthed the President of the United States Donald Trump, to have told Ukrainians not to listen to him or obey his policy . . .

and finally her activities have caught up with her." Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that the fact that then-President Trump had decided, at least at that point, to fire Yovanovitch appears to be the "good news" that Parnas reported back to Lutsenko two days prior.

n. Later that day, in an apparent reference to diGenova's *Fox News* interview, Parnas texted Toensing at the Toensing Number, "I love you and your husband you are the best," and "Tell joe he was awesome my hero." Toensing responded from the Toensing Number, "We can be really great if we have a retainer signed." Based on my participation in the investigation as well as my review of the Search Warrant Returns, I believe that Toensing was telling Parnas, in sum and substance, that her and her husband's efforts to seek the Ambassador's removal were an indicator of how "great" they could be for Lutsenko, and how much more they could do for him, if he signed the retainer agreement and paid them. Parnas agreed, and Toensing (from the Toensing Number) asked if the "Wicket [sic] Witch" was gone, which appears to be a reference to Yovanovitch. Giuliani separately texted Toensing at a Subject Device linked to the Toensing iCloud to say that "Joe is my hero and you too." Based on my review of public statements made by Giuliani and Toensing, I have learned that around this time, Toensing and Giuliani began frequently posting messages related to Ukraine, Yovanovitch, Biden, and the 2016 election on Twitter, apparently in an effort to further magnify the press attention Lutsenko's allegations against Yovanovitch would receive.

o. Based on my participation in an interview with [redacted], a public relations strategist with whom Parnas had previously worked (and to whom he owed money), I have learned that on or about March 22, 2019, Parnas met or spoke with [redacted] and asked him to help Parnas in his efforts to disseminate negative information about the Ambassador. Based on

my review of the Prior Search Warrant Returns it appears that after the meeting, at Parnas's instruction, Correia sent [redacted] a copy of Congressman Sessions's letter, links to *The Hill* articles, and a number of tweets about the Ambassador. Parnas then texted [redacted], "Please send it to me when it goes out." [redacted] sent the materials forwarded by Correia to Ryan Saavedra, a reporter for *The Daily Wire*, as well as a number of conservative social media influencers such as Seb Gorka and Arthur Schwartz, among others. Saavedra published an article in *The Daily Wire* and those influencers tweeted about the Ambassador. On or about March 24, 2019, as discussed above, Donald Trump Jr. retweeted *The Daily Wire* article.

p. Although Parnas, Giuliani, and Toensing appeared to have been pleased with the press response in the U.S., as noted above, the press response in Ukraine was unfavorable to Lutsenko. On or about March 26, 2019, Lutsenko texted Parnas pictures of documents that allegedly contained information about Burisma, and noted, "I hope this is enough." He then complained to Parnas, in sum and substance, that despite the information he was gathering about Biden, the Ambassador had not been fired. In particular, he stated: the "Washington Post is attacking me already . . . Zero results. They want to listen to the tape. I will get the recording device tomorrow and the testimony of the participants of the conversation. My case on Zlochevskyy [the head of Burisma] is moving along nicely. There is evidence about transfers to B [Biden]. And only you cannot get rid of that fool of a woman ☹." Parnas wrote back, "She is not a simple fool of a woman. Believe me. Well, she will have nowhere to go."

q. On or about March 29, 2019, Parnas wrote to Lutsenko, "I was asked to tell you personally that America supports you and will not let you get hurt. It does not matter how it looks now. Everything will soon change and everything will go in the right direction. So that you would know, that you are being talked about here as a true hero of the Ukraine." Lutsenko then

told Parnas that he had additional documents related to Burisma's payments to Hunter Biden, and when Parnas asked Lutsenko to send them to him, Lutsenko replied that he would "forward through the new Ambassador ☺."

r. Over the next several days, Parnas continued to feed information to Solomon, who asked Parnas by text to "eyeball" articles for "accuracy," and continued to publish articles in *The Hill*. On or about March 27, 2019, Parnas told Giuliani that "Hannity just canceled [on Solomon]," which prompted Giuliani to say that "[t]hey are scared[,] I will buck them up." Three days later, on or about March 30, 2019, Giuliani confirmed that he would be appearing on *Fox News* that morning, to which Parnas responded, "Great." Parnas sent some of Solomon's articles to Giuliani, among many other contacts. Solomon also texted with Toensing via a Subject Device linked to the Toensing iCloud to talk about Sean Hannity's show canceling on him. Solomon texted Toensing, "I think everything will be fine once we get Biden reported next [w]eek" and said that "Pompeo told [Giuliani] that ambassador under criminal investigation." Toensing texted back, "Geez. So what could possibly be the rationale to keep her? Makes no sense."

s. When Yovanovitch still had not been removed, Lutsenko continued his complaints about Yovanovitch to Parnas. On or about March 29, 2019, Lutsenko told Parnas that the "ambassador chick organized leak of NABU materials to the TV project financed by you about corruption of those surrounding Poroshenko. Next one is going to be about me." Parnas replied, "I will call you soon with the news." On or about April 2, 2019, Lutsenko texted Parnas, "I am probably the most famous Ukrainian where you are," to which Parnas replied, "This is going to be a big week." On or about April 9, 2019, Lutsenko provided the names of "Advisors and public speakers of the presidential candidate" Volodymyr Zelensky, who was running against Poroshenko, and their alleged connections to Yovanovitch (to whom Lutsenko referred by her

nickname, "Masha"), and wrote that the candidate for Prosecutor-General—who would replace Lutsenko in the event Zelensky was elected—was a "Favorite activist of Masha."

Giuliani's Continued Lobbying of the State Department for Ambassador Yovanovitch's Removal

20. Around this time, based on my review of materials obtained from the State Department as well as public statements made by Giuliani, I have learned that Giuliani facilitated the delivery of a package of materials to Secretary Pompeo in furtherance of his effort to seek Ambassador Yovanovitch's removal. According to a U.S. Department of State Office of Inspector General investigation, in late March or early April 2019, Pompeo received a package that had to do with "Ukraine issues." The package had a return label of "The White House," although it bore no official seal, and contained notes from interviews between Parnas, Fruman, and Giuliani with Shokin and Lutsenko from January 2019 regarding Burisma, Biden, and Yovanovitch. The documents were separated into folders that bore the insignia of the Trump Hotel. The package also contained Solomon's March 20, 2019 articles (discussed above) featuring his interview with Lutsenko, along with documents that appeared to be Solomon's notes and emails regarding the articles.

21. On or about October 2, 2019, Giuliani confirmed to CNN that the package originated with him, and that he gave the documents to the White House, which then passed them to Secretary Pompeo. Giuliani claimed that Pompeo told him that Pompeo would refer the matters detailed in the documents for further investigation.

Continued Efforts to Formalize Relationship with Lutsenko and Seek Ambassador Yovanovitch's Removal

22. Parnas, Toensing, and Giuliani made continued efforts to formalize the relationship with Lutsenko in April 2019. Specifically, based on my review of materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a. On or about April 13, 2019, Giuliani sent Parnas a message, which contained a new retainer agreement, this one between Toensing and diGenova and Lutsenko and his deputy, Kulyk.[13] The agreement indicated that Lutsenko was retaining diGenova & Toensing, LLP to represent him "in connection with recovery and return to the Ukraine government of funds illegally embezzled from that country and providing assistance to meet and discuss with United States government officials the evidence of illegal conduct in Ukraine regarding the United States, for example, interference in the 2016 U.S. elections." The agreement also noted that the firm's services "may entail activities subject to mandatory public disclosure under . . . the Foreign Agent Registration Act[, which] . . . requires the Firm to register and report certain of its activities on behalf of foreign political parties or entities." Per the agreement, Lutsenko would pay a $125,000 retainer and $25,000 per month, plus costs. Based on my review of materials obtained pursuant to the May 16 Warrant, it appears that Toensing subsequently signed a copy of each of the three retainer agreements. Lutsenko did not ultimately pay Giuliani or Toensing any money. Shortly after receiving the retainer, Toensing wrote to Solomon using a Subject Device linked to the Toensing iCloud to nudge him on questions for additional Ukrainian interviews because "Lev

[13] Based on my review of publicly available material, I have learned that Kulyk worked under Lutsenko at that time as the deputy head of International Legal Cooperation. According to an article published on October 5, 2019 in the *New York Times*, Yovanovitch asked Lutsenko to remove Kulyk at a meeting in 2016 due to Kulyk's corruption.

wanted me to work with you," and reported, presumably about the retainer, that "Lev says Yuri should be client."

b. Between in or around April 11 and 23, 2019, Parnas worked with Solomon to arrange additional interviews with Ukrainian government officials, and provided the questions that Solomon would ask one official. Solomon ran multiple articles during that period. However, Lutsenko walked back some of his claims and told *The Babel* on or about April 17, 2019 that Ambassador Yovanovitch had never provided him with a "do not prosecute" list, and it was instead he who had requested that list. In addition, on or about April 21, 2019, Zelensky won the Ukrainian presidential runoff against Poroshenko.

c. On or about April 23, 2019, Parnas texted Giuliani to "text me or call me if you have any news," and Giuliani responded, "He fired her again." Parnas wrote, "I pray it happens this time I'll call you tomorrow." But on or about May 4, 2019, Giuliani texted Parnas, "Boy I'm so powerful I can intimidate the entire Ukrainian government. Please don't tell anyone I can't get the crooked Ambassador fired or I did three times and she's still there." That same day, Lutsenko told Parnas that "People here are talking that there will be a very high level coming from you to the [Ukrainian] inauguration,"[14] to which Parnas replied "You do understand Who is dealing with this." Two days later, on or about May 6, 2019, the State Department confirmed that Ambassador Yovanovitch would leave her post on May 20, 2019. That same day, Parnas reported to Giuliani and Solomon that "Lutsenko [] said Ukraine media is saying that the ambassador is being recalled by us."

[14] Based on my review of public reporting, I have learned that the 2019 Ukrainian election was held on March 31 and April 21 in a two-round system. Volodymyr Zelensky won the election in the second round with 73% of the vote, defeating the incumbent President Poroshenko. Zelensky's inauguration was May 20, 2019.

d. On or about May 9, 2019, Parnas forwarded to Lutsenko three articles entitled "Giuliani previews potential 2020 attack dog role with Biden-Ukraine story," "How Rudy Giuliani's unfounded claims of an anti-Trump conspiracy in Ukraine may have ousted an ambassador," and "Giuliani plans Ukraine Trip to Push for Inquiries That Could Help Trump." However, Toensing appears to have not been pleased with the press coverage regarding her relationship with Lutsenko. On or about May 9, 2019, Toensing texted Giuliani using a Subject Device linked to the Toensing iCloud that if he told the *New York Times* that she had been representing Lutsenko, because "I do not have a client." Giuliani responded "Sorry I thought that's why you were coming?" Toensing wrote, "Pls call. NYT now after me for not registering under FARA. I told you earlier today I had no Retainer with anyone. Now I am being accused of violating FARA. This needs to be corrected ASAP."[15] Giuliani replied by text, "Really." [16]

---

[15] Based on my review of public statements made by a spokesman for Toensing to the *Washington Post* on November 27, 2019, I have learned that Toensing and diGenova had "agreed to represent people they described as 'Ukrainian whistleblowers'" and that those discussions included a possible representation of Lutsenko. However, "all of the retainer letters under consideration included 'the necessary notice of FARA registration,'" which according to the article, "suggest[ed] the couple had planned to register as foreign lobbyists if the agreements had been executed. (https://www.washingtonpost.com/politics/giuliani-was-in-talks-to-be-paid-by-ukraines-top-prosecutor-as-they-together-sought-damaging-information-on-democrats/2019/11/27/636c3e86-112d-11ea-b0fc-62cc38411ebb_story.html). While this statement and the above-referenced text messages reflect a self-professed intention to register for FARA based on Toensing's representation of Lutsenko in the Franklin Templeton matter once there was a signed contract, even assuming those statements are credited, FARA explicitly does not require a written contract. *See* 22 U.S.C. § 612(a)(4). Moreover, the evidence described above indicates that Toensing, Giuliani, and Parnas never had any intention of registering for FARA based on their representation of Lutsenko in connection with their efforts to seek Ambassador Yovanovitch's removal at Lutsenko's direction and request; only that they may have intended to register in connection with the more innocuous sounding "recovery of stolen assets."

[16] Based on my review of public statements made by Giuliani, I have learned, among other things, that Giuliani (i) told the *New York Times* in an interview on or about November 27, 2019, that, with respect to the proposed contract with Lutsenko, "I thought it would be too complicated. I never received a penny." (*See* https://www.nytimes.com/2019/11/27/nyregion/giuliani-ukraine-business-trump.html); (ii) stated on Twitter on November 27, 2019, that "I did NOT pursue a business opportunity in Ukraine, as [the *New York Times*] misrepresented. I could have helped

Toensing wrote Parnas "Pls tell me name of client. What happened? I do not represent Lutsenko. Or anyone else at this moment . . . Who is the person I am supposed to represent? Rudy told NYT I had been representing Lutsenko. I need to get retainer done so this is cleared up." Parnas texted back, "I'm not aware of that but don't worry we will clear everything up [once] you['re] here and will get retainer signed." Toensing asked again for the "complete name so I can have office draft retainer."

e. On or about May 13, 2019, Giuliani texted Parnas a public statement Giuliani intended to make calling for the Bidens to be investigated. Parnas responded "Awesome." Around that time, Parnas sent Lutsenko a copy of a statement issued by Giuliani. On or about June 21, 2019, Lutsenko wrote Parnas, "I think it is time for us to talk with the Mayor. I have 2-2.5 months and I have a plan. I am serious. We have to talk."

<u>Knowledge of FARA and Absence of FARA Registration</u>

23. Based on my review of a publicly-available FARA registration database maintained by the Department of Justice, I have learned that Parnas, Giuliani, and Giuliani Partners have never filed a FARA registration. Additionally, based on my review of those same records, I know that Toensing previously registered under FARA and therefore it appears was aware of the requirement. Specifically, the firm of diGenova & Toensing LLP previously registered on behalf

---

them recover $7B in stolen money, but I didn't. Was paid ZERO." (*See* https://twitter.com/RudyGiuliani/status/1199823401663258624). As noted above, Toensing made similar statements, distancing herself from representation of Lutsenko, after the relationship became public in May 2019 reporting in the *New York* Times. However, based on my review of the information described herein, Giuliani's and Toensing's statements, made after intense media focus on their relationship with Lutsenko and role in Ambassador Yovanovitch's removal, appear to be inconsistent with the materials described herein and indeed intended to distance them from the conduct under investigation. For instance, as described herein, Giuliani appeared close to going forward with the representation of Lutsenko in late February 2019, having sent a retainer agreement and wiring instructions, and it appears the only reason it did not go forward is because Lutsenko did not wire the money.

of the Kurdistan Democratic Party, but never made a filing related to Ukraine or Lutsenko. Based on my review of the Prior Search Warrant Returns, I have learned from Toensing's statements in text messages, discussed above, as well as the language of her draft retainer, that she is aware of FARA's registration requirements.

24. As detailed below, notwithstanding the fact that Giuliani and Parnas had not previously registered, it appears that both Parnas and Giuliani were aware of the FARA registration requirement. Specifically, based on my review of publicly available FARA filings, press reports, and materials obtained via the Prior Search Warrant Returns, I have learned, among other things, the following:

a. On or about July 11, 2018, *The Washington Post* ran an article on Giuliani's work on behalf of foreign clients while he was working for President Trump, and in response to a request for comment, Giuliani stated: "I've never lobbied [President Trump] on anything . . . I don't represent foreign governments in front of the U.S. government. I've never registered to lobby." In September 2018, seven United States Senators wrote to the Justice Department to request a review into whether Giuliani had complied with FARA. In response to the letter, Giuliani told *The Wall Street Journal* that he was working for a U.S. firm and was not trying to influence U.S. policy. He added that he "did nothing to invoke FARA either now or ever" and "never represented foreign interests with [the] U.S. government."

b. Parnas explicitly discussed FARA or was privy to materials about it on multiple occasions. First, in or around January 2017 Parnas sent a contact an article that specifically referenced a FARA registration on behalf of the Ukrainian government. Second, on or about March 5, 2019, one of Parnas's contacts sent him a FARA registration filed by a third party, and Parnas confirmed "Got it." Notably, that FARA registration was completed regarding

lobbying work done on behalf of two embassies (the Embassy of Japan and Liberia) and on behalf of a foreign individual in order to arrange meetings with Congressional representatives and staffers, and set up a Liberian congressional caucus. Third, in or around April 2019, Parnas texted with [redacted], a naturalized Ukrainian-American who resides in Brooklyn, Israel, and Ukraine, regarding Solomon and Lutsenko. On or about April 24, 2019, as part of a conversation unrelated to the lobbying activities detailed above, Parnas asked [redacted] to send him the "fara registration," and [redacted] responded with a FARA registration completed by a public relations firm on behalf of Zelensky.

* * *

25. Based on the above, there is probable cause to believe that the efforts by Giuliani, Toensing, and Parnas to seek the removal of Ambassador Yovanovitch were done at the direction and request of Lutsenko, as a part and in furtherance of the TARGET OFFENSES.[17]

---

[17] Based on my review of public statements made by Giuliani, I have learned that Giuliani has made statements intended to suggest that he sought Ambassador Yovanovitch's removal for reasons independent of his desire to gain business from Lutsenko. Giuliani told the *New York Times* in a December 16, 2019, interview that he "gave them [President Trump and Secretary Pompeo] the facts. I mean, did I think [Ambassador Yovanovitch] should be recalled? I thought she should have been fired. If I was attorney general, I would have kicked her out. I mean – Secretary of State," and that he had "pointed out to the president a couple of times … what I had learned about the visa denials. I may or may not have passed along the general gossip that the embassy was considered to be a kind of out-of-control politically partisan embassy, but that was like, general gossip, I didn't report that as fact." (*See* https://www.nytimes.com/2019/12/16/us/politics/giuliani-yovanovitch-ukraine.html). In an interview with the *New Yorker* published on December 16, 2019, Giuliani stated, "I believed that I needed Yovanovitch out of the way. She was going to make the investigations difficult for everybody." (*See* https://www.newyorker.com/magazine/2019/12/23/the-ukrainian-prosecutor-behind-trumps-impeachment?verso=true) In a December 16, 2019, television interview he stated, "I didn't need [Ambassador Yovanovitch] out of the way. I forced her out because she's corrupt." (*See* https://www.youtube.com/watch?v=qFCeznGIXKs). Giuliani stated on Twitter on December 17, 2019 that "Yovanovitch needed to be removed for many reasons most critical was denying visas to Ukrainians who wanted to come to US and explain Dem corruption in Ukraine. She was OBSTRUCTING JUSTICE and that's not the only thing she was doing. She at minimum enabled Ukrainian collusion." As detailed herein, these statements appear to be inconsistent with

**B. Probable Cause Justifying Search of the Subject Premises and Toensing**

26. There is probable cause to believe that Toensing is in the possession of the SUBJECT DEVICES that were used as instrumentalities and contain evidence of the TARGET OFFENSES, as further described below. There is also probable cause to believe that the SUBJECT PREMISES, closed containers or items therein, contain evidence and instrumentalities of the TARGET OFFENSES, as described below.

Toensing's Use of the SUBJECT DEVICES

27. As described below, there is probable cause to believe that the SUBJECT DEVICES were used by Toensing as instrumentalities of the TARGET OFFENSES and contain evidence of the TARGET OFFENSES.

28. First, as described above, Toensing used the SUBJECT DEVICES, including the SUBJECT DEVICES linked to the Toensing iCloud, to send and receive text messages and place phone calls to Parnas and Giuliani, among others, relating to Ambassador Yovanovitch, attempts to remove her from her post, entering into a retainer agreement with Lutsenko or other Ukrainian government officials, collecting information about Burisma and Biden, and the requirements of FARA. For instance, Toensing used the Toensing Number, which is associated with a Subject Device, and other SUBJECT DEVICES linked to the Toensing iCloud discussed above, to make and receive communications relating to the commission of the TARGET OFFENSES:[18]

the evidence, including the fact that Giuliani did not take actions to seek the Ambassador's firing until *after* Lutsenko had offered a retainer in connection with a potential legal matter, which strongly suggest that acting at Lutsenko's request and direction appears to have been a strong motivating factor for Giuliani. Moreover, and tellingly, none of these statements makes reference to that retainer or the offer of negative information about the Bidens that Lutsenko offered Giuliani shortly before Giuliani's lobbying efforts began.

[18] As discussed above, on November 11, 2019, the FBI and USAO sought and obtained a search warrant for, among other things, the Toensing's iCloud. However, at the time the warrant was executed, the iCloud no longer contained all of the text messages outlined above with Parnas

a. Specifically, as discussed above, Toensing sent and received text messages using SUBJECT DEVICES associated with and/or linked to the Toensing Number and the Toensing iCloud relating to the firing of Ambassador Yovanovitch. For instance, on February 11, 2019, as discussed above, Toensing used a Subject Device linked to the Toensing iCloud to ask Giuliani, "Is there absolute commitment for HER to be gone this week?" Giuliani responded: "Pompe[o] is now aware of it." Toensing also sent and received text messages using a Subject Device linked to the Toensing iCloud relating to being retained by Lutsenko. For instance, on February 14, 2019, Toensing sent Giuliani a message using a Subject Device linked to the Toensing iCloud that read: "How is Retainer Agreement coming? Our hands are pretty tied about doing much until we have it in place as we need it for FARA." As such, there is probable cause to believe that the SUBJECT DEVICES thus contain evidence of and relating to the TARGET OFFENSES.

29. Second, in addition to records of text messages and calls, the SUBJECT DEVICES are likely to contain other evidence of the TARGET OFFENSES, including emails, documents, notes, audio and video recordings, and GPS data. Specifically:

a. There is probable cause to believe that the SUBJECT DEVICES will contain email evidence of the TARGET OFFENSES. Toensing used email addresses associated with her iCloud account to send draft retainer agreements on or about April 12, 2019. Based on my review of the Prior Search Warrant Returns, I have learned that Toensing has both an iPhone and iPad and used both to send and receive emails relevant to the TARGET OFFENSES. More generally, based on my training and experience, as well as my review of product information provided by Apple, I

---

and Giuliani during the December 2018 to April 2019 time frame, some of which the Government obtained from other sources. Based on my training and experience, as well as my review of records provided by Apple, I believe the iCloud account did not contain text communications because Toensing did not backup that content, or removed it from the backup, but that it may continue to exist on the SUBJECT DEVICES themselves.

know that cellphones and tablets, including iPhones and iPads, can be used to send, receive, and store emails. I also know from my training and experience that email accounts and their contents, including emails maintained on cellphones, that have been used in furtherance of the TARGET OFFENSES often contain records of that activity, including email correspondence, address books with contact information for co-conspirators, and documents saved as email attachments.

b. In addition to emails, there is probable cause to believe that documents will be found on the SUBJECT DEVICES. Indeed, I know from my training and experience that document attachments to communications can be saved intentionally or as a result of a cellphone's or tablet's operating system or web browser to the cellphone itself. Tablets and computers can also be used to create documents in word processing programs, like Microsoft Word. Additionally, from my training and experience, I know that users of cellphones, tablets, and computers who are engaged in the commission of the TARGET OFFENSES often store important documents relevant to that activity on their devices, and also maintain notes of meetings and telephone calls on their devices. Such documents can include, but are not limited to, Microsoft Word and PDF documents, drafts, scans, bank statements received from financial institutions, and government filings. As discussed above, the commission of the TARGET OFFENSES involved the use of documents including signed and draft retainer agreements, notes of meetings with Lutsenko and others, and documents provided by Lutsenko, and therefore some or all of those types of documents are likely to be found on the SUBJECT DEVICES.

c. There is also probable cause to believe that the SUBJECT DEVICES contain multimedia, such as videos, audio records, and photographs, that are evidence of the TARGET OFFENSES. For example, from my review of the Prior Search Warrant Returns, I know that Toensing used her iCloud account to exchange multimedia, including links to articles and photos,

with Parnas and Giuliani in furtherance of the TARGET OFFENSES. More generally, I know that cellphones can contain photographs and videos of meetings and documents, audio recordings of telephone calls and meetings, and screenshots of text messages. Because I know that co-conspirators often exchange such documentary evidence with each other to further a criminal scheme and/or keep records of their activity, the SUBJECT DEVICES are likely to contain such evidence.

d. In addition to text messages, call logs, emails, documents, and multimedia (including photographs, videos, audio recordings, and voicemails), the SUBJECT DEVICES are also likely to contain other records that are evidence of the commission of the TARGET OFFENSES. Specifically, based on my training and experience and review of the Prior Search Warrant Returns, including Toensing's iCloud account and her communications with Giuliani and Parnas, there is reason to believe that the SUBJECT DEVICES will contain contact information of co-conspirators and/or witnesses (such as contact cards), internet search and browser history which may reveal Toensing's state of mind at the time of the commission of the TARGET OFFENSES, and GPS data and calendar entries, which may reveal Toensing's presence at meetings with co-conspirators or other relevant witnesses.

30. Third, I understand from my training and experience, and my review of publicly-available information, that even for cellular telephone data and files that were created or last modified in 2018 or 2019, there is reason to believe that they can still be recovered from one or more of the SUBJECT DEVICES. Specifically:

a. From my training and experience, I have learned that electronic files, or remnants of those files, downloaded to a cellular telephone can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-

available forensics tools. When a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space–that is, in space on the cellular telephone that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space–for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a cellular telephone depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and cellular telephone habits.

b. Additionally, I have learned from my training and experience, and review of publicly-available information, that a person can transfer data from an old phone to a new phone, including, for example, mail, contacts, calendars, photos and videos, books and pdfs, call logs, and text messages. However, as noted above, it appears that the cellphone assigned the Toensing Number is still active. In addition, based on my review of the location data obtained pursuant to the GPS Warrant, I have learned that the Toensing Number is still active, was located in the vicinity of SUBJECT PREMISES-1 as of the evening of April 18 to the morning of April 21, 2021, and was located in the vicinity of SUBJECT PREMISES-2 as of the afternoon of April 21, 2021.

Evidence in the SUBJECT PREMISES

31. The applied-for warrant would authorize the search of the SUBJECT PREMISES and any closed containers or items contained therein, for the purpose of seizing any SUBJECT DEVICES found in the SUBJECT PREMISES, as particularly described in Attachment B. As described below, there is probable cause to believe that Toensing maintains residences at both SUBJECT PREMISES-1 and SUBJECT PREMISES-2, and that the SUBJECT PREMISES will contain one or both of the SUBJECT DEVICES containing evidence, relating to the commission of the TARGET OFFENSES.

a. First, there is probable cause to believe that Toensing lives at SUBJECT PREMISES-1.[19] Specifically, I have learned the following:

i. Based on my review of records from the [redacted] Motor Vehicle Administration, I have learned that Toensing's address is listed as the address of SUBJECT PREMISES-1.

ii. Based on my review of records for [redacted], Department of Finance and Department of Assessments and Taxation, I have learned that Toensing and DiGenova are the listed owners of SUBJECT PREMISES-1.

b. Second, there is probable cause to believe that Toensing maintains a separate residence at SUBJECT PREMISES-2. Specifically, I have learned the following:

[19] Through my participation in this investigation, I have learned that Toensing and diGenova also recently purchased a residence in [redacted]. It is not clear whether they intend to permanently reside in [redacted]. In any event, as discussed below, based on my review of location data obtained through the GPS Warrant, I have learned that the Toensing Number has been located in the vicinity of SUBJECT PREMISES-1 since at least the evening of April 18, 2021 to the morning of April 21, 2021. Until that time, the Toensing Number had been located primarily near Toensing and diGenova's new residence in [redacted] since at least April 14, 2021 when the FBI first began receiving location data pursuant to the GPS Warrant.

i. Based on my review of records for [redacted], Department of Assessments and Taxation, I have learned that Toensing and DiGenova are the listed owners of SUBJECT PREMISES-2, SUBJECT PREMISES-2 is not listed as their principal residence, and the mailing address listed for Toensing and DiGenova is the address for SUBJECT PREMISES-1.

ii. Based on my review of publicly available images of SUBJECT PREMISES-2, SUBJECT PREMISES-2 is on the waterfront and appears to be a vacation home.

c. Second, based on my training and experience, I have learned that individuals regularly keep electronic devices such as cellphones in their homes. Indeed, based on my review of the Prior Search Warrant Returns, it appears based on the time text messages and emails are sent (i.e., early or late in the day) that Toensing regularly operates the SUBJECT DEVICES to send and receive messages and phone calls – and has done so relevant to the TARGET OFFENSES – at times a person would typically be at home.

d. Third, based on my review of materials obtained from Apple, I have learned that Toensing purchased three new iPads in or about May 2019 and registered each one under the Toensing iCloud Account. Based on my training and experience, I have learned that individuals do not ordinarily travel with older versions of electronic devices once they have purchased new versions of those devices and instead maintain older versions of their electronic devices in their principal place of residence. Accordingly, while I believe Toensing traveled to SUBJECT PREMISES-2, her vacation home, on April 21, 2021, I believe it is unlikely that she brought with her the Toensing iPad, one of the SUBJECT DEVICES, and that the Toensing iPad likely will be located at SUBJECT PREMISES-1, her primary residence.

e. Finally, as noted above, based on my review of the location data obtained pursuant to the GPS Warrant, I have learned that the Toensing Number is still active and was located in the vicinity of SUBJECT PREMISES-1 in the morning of April 21 in [redacted], and by the afternoon was located in the vicinity of SUBJECT PREMISES-2 in [redacted].

<u>The SUBJECT DEVICES in the Possession, Custody, or Control of Toensing</u>

32. The applied-for warrant would authorize the seizure from Toensing of the SUBJECT DEVICES as evidence or instrumentalities of the TARGET OFFENSES, as particularly described in Attachment B. As described below, there is probable cause to believe that one or more of the SUBJECT DEVICES are likely to be found on Toensing's person or in her possession, custody, or control.

a. First, based on my review of publicly available information, I believe that Toensing carries her cellphone with her at nearly all times. For instance, based on my review of screenshots of a May 13, 2020 interview with Toensing and diGenova, I have learned that Toensing held what appears to be an Apple iPhone in her hand: [20]

---

[20] Available at https://web.archive.org/web/20200720210329if_/https://www.youtube.com/watch?v=SLpyzWOEOt8.




What Obama's team can be charged with. Joe DiGenova and Victoria Toensing with Sebastian Gorka

135,724 views • May 13, 2020 8.4K 111 SHARE SAVE

b. Second, based on my training and experience, I have learned that individuals regularly keep electronic devices such as cellphones in their homes or on their persons. Indeed, based on my review of the Prior Search Warrant Returns, it appears based on the time text messages and emails are sent (i.e., early or late in the day) that Toensing regularly operates the SUBJECT DEVICES to send messages from wherever they are residing at the time those messages are sent. Accordingly, there is probable cause to believe that the Toensing will have one or more of the SUBJECT DEVICES on her person, in her personal possessions (like a purse, briefcase or backpack). Finally, as noted above, based on my review of the location data obtained pursuant to the GPS Warrant, I have learned that the Toensing Number is still active and was located in the vicinity of SUBJECT PREMISES-1 as of the evening of April 18 to the morning of April 21, 2021, and was located in the vicinity of SUBJECT PREMISES-2 as of the afternoon of April 21, 2021.

* * *

33. Based on the foregoing, I respectfully submit there is probable cause to believe that Toensing and others engaged in criminal activity in violation of the TARGET OFFENSES, and that evidence of this criminal activity is likely to be found in the SUBJECT PREMISES and on Toensing's person. Specifically, based on the foregoing, there is probable cause to believe that the SUBJECT DEVICES will be found in the SUBJECT PREMISES and on Toensing's person.

**PROCEDURES FOR UNLOCKING BIOMETRICALLY SECURED DEVICES**

34. The warrant I am applying for also would permit law enforcement agents to obtain from the person of Toensing (but not from any other individuals present at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the device(s). The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once

a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in

some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. As discussed above, there is reason to believe that one or more digital devices will be found during the search of the SUBJECT PREMISES and Toensing's person. The passcode or password that would unlock the device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

i. Due to the foregoing, I respectfully request that the Court authorize that, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from Victoria Toensing the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

j. If successful at unlocking the device(s), law enforcement is authorized to access the device for the purposes of disabling any auto-lock or password feature and/or to place the device(s) into "airplane mode."

k. While attempting to unlock the cellular telephone by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific

biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the cellular telephone(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any cellular telephone(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any cellular telephone(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

35. If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (xv) evidence of the TARGET OFFENSES.

**CONCLUSION AND ANCILLARY PROVISIONS**

36. Based on the foregoing, I respectfully request the court to issue a warrant to search the SUBJECT PREMISES and the person of Victoria Toensing and to seize the SUBJECT DEVICES specified in Attachment B to this affidavit and to the Search and Seizure Warrant.

37. In light of the confidential nature of the continuing investigation, and the fact that premature disclosure of this affidavit could alert subjects of the investigation as to the nature and scope of the investigation, thereby prompting them to destroy evidence, shape their testimony, or tamper with witnesses, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Respectfully submitted,

[redacted]

Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 22nd day of April, 2021.

_______________________________
HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A-1
**Location to Be Searched**

[redacted]

The premises to be searched (the "SUBJECT PREMISES") are described as follows, and include all locked and closed containers found therein: the Premises particularly described as [redacted], which is a white, two story residence with columns in the front, as pictured below:

[redacted]

## ATTACHMENT A-2
**Person to Be Searched**

The person to be searched is VICTORIA TOENSING, born [redacted], SSN ending in [redacted], including any personal effects, pictured below, provided at the time of the execution of the search warrant she is located in the District of Maryland.



**ATTACHMENT A-3**
**Location to Be Searched**

[redacted]

The premises to be searched (the "SUBJECT PREMISES") are described as follows, and include all locked and closed containers found therein: the Premises particularly described as a gray and white, two-story residence as pictured below:

[redacted]

**ATTACHMENT B**
**Property to Be Searched for and Seized**

This warrant authorizes the seizure of any the following devices (the "SUBJECT DEVICES") as instrumentalities or containing evidence of violations of 22 U.S.C. §§ 612 and 618 (acting as an unregistered foreign agent), 18 U.S.C. § 2 (attempting to and willfully causing a violation of the foregoing statutes), and 18 U.S.C. § 371 (conspiracy to violate the foregoing statutes) (the "TARGET OFFENSES"): (1) an Apple iPhone 7 assigned the telephone number [redacted]; and (2) a silver Apple iPad Pro 9.7.

**USE OF BIOMETRIC DATA TO UNLOCK SUBJECT DEVICES**

During the execution of the warrant, law enforcement personnel are authorized to obtain from Victoria Toensing the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

If successful at unlocking the device(s), law enforcement is authorized to access the device(s) for the purposes of disabling any auto-lock or password feature and/or to place the device(s) into "airplane mode."

While attempting to unlock the cellular telephone by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the cellular telephone(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any cellular telephone(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any cellular telephone(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.